Filed 12/18/24

CERTIFIED FOR PARTIAL PUBLICATION*


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STEPHEN JAMES LATTIN,<br><br>    Defendant and Appellant. | D083262<br><br><br>(Super. Ct. No. FVI22003394) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Melissa Rodriguez, Judge.  Affirmed in part, reversed in part and remanded for further proceedings.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A.

---

*       Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts DISCUSSION III, IV, V, VI.

Swenson and Christine Y. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Stephen James Lattin contends a gun must be loaded to commit assault with a firearm unless it is used as a club or bludgeon. (Pen. Code,[1] § 245, subd. (a)(4).) He asserts the present ability element of assault cannot be satisfied with an unloaded gun if the defendant is too far from the victim to inflict injury with the firearm as a club or bludgeon. Based on his understanding of the law, he requested a pinpoint instruction that an assault with a deadly weapon is not committed by a person "pointing an unloaded gun . . . with no effort or threat to use it as a baton" or "pointing an unloaded gun in a threatening manner" at another person. The trial court declined to give his pinpoint instruction to the jury. He asserts this was prejudicial error, and further claims the evidence was insufficient on present ability to support his conviction for assault with a firearm. We reject both contentions.

In the published portion of our opinion, we conclude there is no brightline rule in California that, unless it is used as a club or bludgeon, a gun must be loaded for an assault to be committed. Proof that a firearm was unloaded can be a complete defense to charges of assault, but it is not a complete defense in all circumstances as a matter of law. If ammunition is readily available—and here there was sufficient evidence it was—it is a question for the jury whether a defendant with an unloaded gun possesses the means to load the gun and shoot immediately, or whether he is too many steps away from inflicting injury to have the present ability to commit assault.

---

[1] Undesignated statutory references are to the Penal Code.

2

In reaching this holding, we acknowledge our disagreement with the Judicial Council of California Criminal Jury Instructions. One of the practice notes for CALCRIM No. 875, the model instruction for assault, states a "gun must be loaded unless used as [a] club or bludgeon" in order "to have [the] present ability to inflict injury." (Use Note to CALCRIM No. 875, capitalization omitted.) We respectfully disagree and suggest the authors reconsider the note.

In the unpublished portion of our opinion, we reject Lattin's other claims of trial error, but we conclude the trial court erred at sentencing when it imposed the upper term based on sentencing factors that were neither found true by a jury beyond a reasonable doubt nor subject to an exception to this fundamental right. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 483–484 (*Apprendi*).) We thus affirm the judgment with respect to all four convictions, but we vacate the sentence and remand for proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Charges and Sentence*

In December 2018, the People filed an amended information alleging Lattin committed four counts of assault with a firearm (§ 245, subd. (a)(2); counts 1–3, 6) and four counts of criminal threats (§ 422; counts 7–10) against four victims—Michael B., Jz.R., An.D., and Anthony R. As to these eight counts, the People alleged Lattin personally used a firearm (§ 12022.5, subd. (a)) and committed the offenses as hate crimes (§ 422.75, subd. (a)). He was further charged with two more counts of being a felon in possession of a firearm (§ 29800; count 4) and a felon in possession of ammunition (§ 30305; count 5). A year later, a jury acquitted Lattin on all counts of making a

criminal threat and all hate crime allegations. It convicted him on the remaining charges, including the four counts of assault with a firearm, and found the gun enhancements to be true.

In Lattin's first appeal, we reversed the four convictions for assault with a firearm and the associated gun enhancements because the trial court prejudicially erred in failing to instruct on self-defense. We upheld the other convictions for felon in possession of a firearm and ammunition. (*People v. Lattin* (July 28, 2022, D079150) [nonpub. opn.].)

On remand, the People dismissed and refiled the assault with a firearm counts in a new case. In the operative information filed in December 2022, Lattin was again charged with four counts of assault with a firearm against the same victims (§ 245, subd. (a)(2); counts 1–4), each with a personal gun use enhancement (§ 12022.5, subd. (a)). Nine sentencing aggravating factors were alleged within the meaning of section 1170, subdivision (b) (hereafter, 1170(b)).

In March 2023, a second jury convicted Lattin of one count of assault with a firearm and found true the gun enhancement with respect to Michael only. As to the remaining three counts involving Jz.R., Anthony, and An.D., the jury convicted Lattin on the lesser-included misdemeanor offenses of simple assault (§ 240).

In April 2023, the trial court sentenced Lattin to a total prison term of nine years and four months. It selected the upper term of four years on the assault with a firearm conviction plus four years for the gun enhancement and imposed concurrent six-month terms for each of the simple assault convictions. The court then resentenced him on his convictions from the earlier trial, imposing one-third the midterm of eight months for possession

4

of a firearm by a felon, and one-third the midterm of eight months for possession of ammunition by a felon.

## II.

### *Trial Evidence*

A.    *Testimony by the Victims, Joshua H. and Trayshawn W.*

An.D. has two children, Jz.R. and Anthony. In 2017, Jz.R. was 15 years old and Anthony was 14. Michael was the children's godfather, but they regarded him as their father or stepfather and called him "dad."

On April 5, 2017, around nine or 10 o'clock, the family drove in two cars to a gas station in Helendale, California. They went to get gas and see two friends who worked at the station, Joshua H. and Trayshawn W.

Shortly after the family got there, Lattin drove into the parking lot with his two young children. He parked his car and went into the gas station market. He was already "angry" when he arrived.

An.D., Jz.R., and Anthony knew Lattin from a prior incident that took place in front of their home a few months earlier. Two boys from Jz.R's school had called Anthony "the N word" and were "being racist." Lattin drove by and the boys "flagged him down." Lattin reversed his vehicle, came back, took out a shotgun, and "aim[ed]" it at Anthony.

When Anthony saw Lattin at the gas station, he told his family, "That's the guy. That's the guy who pulled the shotgun on us."

Lattin came out of the market "very angry." "He just burst out" and started "[r]anting in anger," using racial slurs, and "going off." Looking at the family, he said: "You bitches gonna get it." "I'm a [P]eckerwood."[2] He

---

[2]    As we later explain, a gang detective testified that "Peckerwood" typically refers to "white inmates or white criminals [who] are involved in gang and criminal activity."

said he was going to kill them.  The family had said nothing to provoke Lattin.  They were terrified.

Although An.D. and her children were Hispanic, Lattin (like others) perceived them and Michael to be African American.  Joshua and Trayshawn are also both African American.

As Lattin was yelling, he went to the trunk of his car and pulled out a shotgun.  He racked it once.  Lattin then "wave[d]" the shotgun "around towards" the family and pointed it at each one of them.  All the while, he continued to say, "You bitches gonna get it" and "I'm from [P]eckerwood." Jz.R. heard him say "he was going to lynch us niggers."

There was no testimony by any witness that anything came out of the shotgun when Lattin racked it at this point in time.  Jz.R. "never saw anything come out of the [shot]gun"; she "never saw ammunition at any point."  But she was not focused on "shotgun shells" that night as she was just worried about her family.  An.D. testified Lattin was "pumping" the shotgun but "no ammo came out because he didn't pull the trigger."  Jz.R., Anthony, and Trayshawn also did not see any shotgun shells in the fabric cartridge holder that was attached to the shotgun.

Lattin pointed the shotgun at "everybody in the parking lot."  He said he was going to kill them.  Jz.R., Michael, Anthony, and An.D. each thought they were going to die that night.  Lattin then put the shotgun back in his car and "sped off."

To everyone's surprise, Lattin returned a few minutes later.  With screeching tires, he drove his car around the parking lot in a big circle.  An.D. and Jz.R. were standing outside An.D.'s car and he "almost sideswiped" them when he passed by.

The family had gotten back into their two cars to leave. But Lattin got out of his car and started walking towards Michael's car, "like, he wanted to fight or something." Michael believed if Lattin could get his shotgun from the trunk, "he would have been shooting." Concerned about the shotgun, Michael put his car in reverse toward Lattin. Michael testified he did not hit Lattin with his car, but according to Anthony and Joshua, the car made contact and knocked Lattin to the ground.

Michael got out of his car and the two men began fighting. Joshua heard Michael tell Lattin repeatedly, "I'm not letting you get to that gun." Michael's "focus was to keep [Lattin] from going to the trunk to get the gun."

While the two men were fighting, Anthony took the keys out of the ignition of Lattin's car and threw them into a field. He did not want Lattin to leave again. As he was getting the keys, Anthony did not see any shotgun shells in the car.[3] He explained the interior of the car was dark and he was only focused on getting the keys out.

Anthony saw that Lattin was "getting the best" of Michael so he joined the fight. He kicked Lattin while he was on the ground and Michael punched Lattin several times in the face. Lattin's nose and lips were bloody, and he had a "huge knot" on his head, about two inches big, that extended down to the right side of his face.

Lattin eventually stopped fighting and told Michael he was sorry. Michael "thought he was genuine" so he let Lattin get up. But after Lattin caught his breath, Michael heard someone yell, "he gots a gun." Michael looked back and saw Lattin in his car pointing the shotgun at him. At that

---

[3]     At the first trial, Anthony testified he saw "brightly colored shells" in the car but left them there.

point, Michael saw Lattin "make a motion with the shotgun in which he grabbed the bottom front of it and pulled it back and forth." He saw "[a]n orange shell" eject out from the shotgun into Lattin's car.[4] Michael "took off running" into the dirt field.

An.D and Jz.R. gave somewhat different accounts as to what happened after Lattin almost sideswiped them when he returned. According to An.D., Lattin threw rocks at her and Jz.R. and then "popped" his trunk and got his shotgun. He "pumped it"—making a "ching, ching" sound—and started pointing it at her and her daughter. At some point, the family had gotten back into their cars to leave. But then Michael got out of his car and approached Lattin. Lattin pointed the shotgun at Michael and "pumped it" again.[5] As the two men began to fight, An.D. and Jz.R. ran to the market for safety. Inside, An.D. called 911. On the audio recording of the 911 call, An.D. told the dispatcher that Lattin pulled a shotgun on her and her kids and was "out there trying to kill us." As she was speaking with the dispatcher, An.D. said, "He just cocked the gun!" An.D. explained she had

---

[4]    Defense counsel attempted to impeach Michael with his prior testimony from the preliminary hearing. At that time, when Michael was asked, "You saw him making the pumping motion?" Michael responded he did, several times. Defense counsel then asked, *But nothing came out of the gun?* (Italics added.) To that question, Michael answered, *I didn't hear nothing when I ran to the dirt field I hit the ground and I just started running until I went, you know, where it's dark over there.* (Italics added.) At trial, on redirect, Michael explained he was "referring to gunfire and bullets being shot out of the gun" when he testified, "I didn't hear nothing."

[5]    An.D. acknowledged that at the preliminary hearing she testified Lattin "pump[ed] or rack[ed]" the shotgun "five to ten times" and "nothing came out."

"some difficulty seeing out of the storefront," in part because her diabetic condition makes her vision blurry.

Jz.R. testified that, after Lattin almost sideswiped her and her mother, Michael nearly hit Lattin when he was reversing his vehicle. She did not see Michael actually hit Lattin. Lattin "caught his balance" and then went to the driver side window of Michael's car and "start[ed] socking him, punching him through the window of the car." Michael got out and the two men began to fight. Jz.R. tried to call 911 but her phone was not working. Joshua and Trayshawn then told her and her mother to run into the market. Anthony stayed outside to help Michael fight Lattin, but she did not see the fight. Through a store window, Jz.R. saw Lattin try to leave but when he realized his keys were gone, he went back and "got his shotgun and tried to shoot" Michael. She watched as Lattin "cocked [the gun] twice" and "tried to shoot at [her] dad . . . directly at his back as he wasn't looking." This time she also did not see anything come out of the gun or any ammunition, including "shotgun shells hanging from the gun."

Right when Lattin had "cocked" or "racked" the shotgun again and aimed it at Michael, a group of people who knew Lattin pulled up into the gas station parking lot in two vehicles, a blue pickup truck and a black sedan (later identified as a black Mazda). They called him "Stevo" and "tried to calm [Lattin] down." They pleaded with him "not to do it, not to shoot and don't do it."

Lattin stopped aiming the shotgun at Michael and gave it to the people in the black Mazda. They began to drive off with the shotgun, but their car "broke down" and they were unable to leave. Just as An.D. told the dispatcher on the 911 audio recording that Lattin had put the shotgun in a

9

black vehicle with other people, sheriff's deputies arrived. An.D. screamed to the deputies, "He's armed and dangerous! It's in the black car."

B. *Lattin's Testimony*[6]

Lattin drove his car, with his son and daughter, to the gas station on April 5, 2017. As he opened his car door, he saw Anthony and Michael standing near the gas pumps. One of them said to Lattin, " 'What the fuck are you doing here, cracker? We are going to fucking smoke you and your family.' " They "went into a past experience." Lattin initially ignored the remarks but became "agitated" by them once inside the market.

When he returned to his car, Lattin saw his son "hanging" out the car window and heard Anthony and Michael "still saying something." Lattin then saw Michael "clutching his waist" while repeatedly saying, " 'I will get you and your family' " and " 'You ain't gonna do nothing. You ain't nothing but a punk bitch.' " Worried that Michael was armed and believing he and his two children might be "kill[ed]," Lattin grabbed his shotgun from his car trunk, and, while sitting inside the car, pumped it about four or five times "to make sure it was cleared." Lattin claimed he never pointed the weapon at any of the victims. He also denied calling them the " 'N' word," saying he was "of Peckerwood," or threatening to "kill" them.

When asked if he had any "shotgun cartridges, red, orange, or any other color" with him during the encounter, Lattin testified, "I'm almost a hundred percent certain there was nothing in there as far as shells or rounds. I'm almost positive," then added, "I don't know for sure." When asked why he

---

6    Lattin did not testify at the second trial, but the People introduced his sworn testimony from the first trial through a reader. Our summary of his testimony is taken from our decision in the prior appeal. (*People v. Lattin*, *supra*, D079150.)

10

retrieved an unloaded shotgun in that circumstance, Lattin testified, "To be honest, I don't know."  He explained he was "depressed" and "emotional" due to the recent loss of a son, and that he and his wife had argued earlier that night.  Lattin said he believed that, if in fact Michael had a gun, it might "be the easiest way to go out."

Lattin left the gas station because his children were in the car and his son was scared.  After dropping them at home, Lattin drove back to the gas station to look for his wallet.  When he returned, Lattin was surprised to see Anthony and Michael still at the gas station.  He denied driving his car close to An.D. or her daughter.  He also denied loading his shotgun before returning to the station.

After being pelted with rocks, Lattin stopped his car in the parking lot and got out.  Lattin heard a "screech[ing]" sound and, without warning, was struck "full-on" by Michael's car, knocking him to the ground.  Once on the ground, Lattin was "pummeled" by Michael, who at some point was joined by Anthony.  Lattin suffered a bloody nose and lip, a contusion on his forehead, and a possible concussion, leaving him in a "fog."

Lattin managed to return to his car but found the keys missing from the ignition.  As he sat in his car, Michael opened the driver-side door and continued his attack.  Lattin then saw a black-colored Mazda being driven by a friend arrive at the gas station.  Lattin's wife and another female were also in the Mazda.

During cross-examination, Lattin testified he could not "recall" retrieving the shotgun from his car after he returned to the gas station.  Nor could he "recall" how the shotgun ended up in the trunk of his friend's Mazda.

The prosecutor asked Lattin, "But you don't remember handing over the [shot]gun, *handing over the ammunition to Thomas* [the friend and driver

11

of the Mazda], or anything from the black car?" (Italics added.) Lattin answered, "I'm sure I didn't, but I don't remember. I can't say yes or no for certain. I can't."

Lattin admitted that at least two of the shotgun shells found in the center console of the Mazda would work in his shotgun, and that he was "familiar" with those shells.

C.    *Detective Malcolm Page*

Detective Malcom Page was among the deputies who responded to the gas station. Page, a former firearms instructor, also testified as the People's gun expert.

At the scene, deputies recovered a "12-gauge Mossberg shotgun" from inside the trunk of the black Mazda driven by Lattin's friend. It was unloaded and appeared operable. The weapon was "a black pump-action shotgun" with an approximate 16-inch barrel and had "multiple accessories." There was a "folding stock" that folded over on top of the weapon system. A "5 shot[ ]" square cartridge holder was affixed to the folding stock. The front portion underneath the weapon system that is used "to chamber or to rack it" had a fabric attachment.

There were no shells in the cartridge holder. There were no shells in Lattin's car and no shells on the ground in the area surrounding the gas station. There were also no shells in the trunk of the black Mazda. However, deputies found "three live 12-gauge cartridges" in the black Mazda, inside a cup holder near the center console "just behind the shifter." The ammunition was "compatible" with the shotgun. No other firearm or "anything related to any firearms of any other caliber" were found inside the Mazda.

Detective Page explained in detail how the shotgun worked when it was racked, both when it was loaded and unloaded, and what an observer would

see when this happened.  To load the weapon, the "forend needs to be pumped forward to close the chamber or the action, and it [then] needs to be pumped backwards to eject expended cartridges and to clean the weapon system."  When the shotgun magazine in this type of shotgun is loaded with a single cartridge and racked, the cartridge is pushed into the chamber and locked into place.  When the shotgun is loaded with two cartridges and racked, one cartridge is pushed into the chamber and locked in place and one "remain[s] underneath as the next cartridge on deck, ready to be loaded into the weapon."

Significantly, once a cartridge is locked into place in the chamber, the user *cannot rack the gun again* unless he either pulls the trigger or presses the "firearm release," which ejects the chambered cartridge "outside and away from the weapon."  Thus, if the shotgun magazine is loaded and racked once, a "shell goes into the chamber."  In order to rack it again, a shell must be expended.  Explained another way, if the shotgun "is racked at least twice and it [is] loaded, it expends a shell, assuming it's operating correctly."  By contrast, when this type of pump action shotgun is racked repeatedly when it is unloaded, "nothing is going to happen."  "There's nothing in the tube magazine, nothing to get released to kind of get in line to be chambered next."

Detective Page also gave his opinion as to how long it would take to load the shotgun:  It would take only "a second or two" for someone competent and familiar with the shotgun to place a shell inside the magazine and rack the shotgun so "it's ready to fire."

DISCUSSION

I.

*No Reversal for Instructional Error*

A key dispute at trial was whether Lattin had the present ability to commit assault. The prosecution had two theories for why Lattin had the present ability to apply force with the shotgun. The prosecutor argued the evidence showed the shotgun was either loaded, or if not loaded, the evidence showed Lattin had ammunition readily available and could load it within seconds. The defense theory, accordingly, was "there was no evidence that the [shot]gun was loaded or was ever near any shotgun shells."

Lattin requested a pinpoint instruction to link the evidence at trial to his defense theory for why the prosecution failed to prove present ability, which the trial court refused. We agree he was entitled to have the jury provided with additional instruction under the particular circumstances presented here. The standard instruction (CALCRIM No. 875) did not fully and adequately advise the jury on the element of present ability in light of conflicting evidence that the shotgun may or may not have been loaded and that Lattin may or may not have had the means to quickly load it. But he was not entitled to the pinpoint instruction as he had drafted it.

Lattin's proposed instruction rested on an incorrect understanding of the law. In his view, there is a brightline rule in California that a gun must be loaded for a person to commit an assault with a firearm except under the unusual circumstance where it is used as a club or bludgeon. We reject such a brightline rule. We hold an assault with a firearm can be committed with an unloaded gun by a defendant who has ammunition available and the means to load it immediately.

14

Thus, the trial court correctly refused to give Lattin's pinpoint instruction *as drafted*, because it was partly incorrect given the evidence that the shotgun could be loaded in seconds. This begs the question whether the court had a duty to modify the instruction and "tailor" it to the particular facts of the case. (*People v. Falsetta* (1999) 21 Cal.4th 903, 924 (*Falsetta*).) We observe the trial court may have erred when it failed to instruct the jury *before deliberations* with a corrected version of the pinpoint instruction that was needed for them to assess the element of present ability. However, any error was harmless because the court gave a revised, correct instruction in response to the jury's questions. Our review here is de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)

A.    *Additional Background*

The trial court instructed the jury with the elements of assault with a firearm using CALCRIM No. 875: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] 4. When the defendant acted, he had the *present ability* to apply force with a firearm to a person; [¶] AND [¶] 5. The defendant did not act in self-defense." (Italics added.) There were no other instructions given on the element of present ability.

Based on his understanding of the law, Lattin asked for a pinpoint instruction on the present ability element of assault that stated:

"[P]ointing an unloaded gun at another person with no effort or threat to use it as a baton is not an assault with a deadly weapon."

"[A]n assault is not committed by a person here by pointing an unloaded gun in a threatening manner [at] another person."

"The present ability element of assault is satisfied . . . when a defendant has obtained the means and . . . ability to inflict injury on the present occasion . . . . An assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position that injury would not be immediate in the strictest sense of that term."[7]

The trial court declined to give Lattin's pinpoint instruction.

During closing argument, the prosecutor argued repeatedly that assault with a firearm could be committed with an unloaded gun if a defendant "has the means to load it and present ability to inflict harm." Lattin lodged two formal objections to the prosecutor's statement of the law. After arguments concluded, Lattin objected again and asked for additional instruction to the jury and for surrebuttal. Lattin's trial counsel argued: "[T]he law [has been] for a long time and it remains so today, that pointing an unloaded gun at someone does not constitute assault with a firearm. . . . The standard[ ] for present ability is not whether or not a bullet is accessible. There's not been a single case [in] the Supreme Court of California that present ability exists if [the] gun is unloaded."

The trial court overruled Lattin's objections. In the court's view, "[n]umerous California cases establish an assault may be committed even if the defendant is several steps away from fully inflicting injury." And

---

7    We have removed some explanatory interjections from defense counsel's oral request for this instruction.

16

therefore, pointing an unloaded shotgun at someone does not constitute an assault with a firearm "[a]s long as they have no means to load it."

During deliberations, the jury sent a note to the trial court asking: "To determine if the greater verdict, does there have to be ammo readily available to the defendant? Or gun have to be loaded?"

The trial court responded to the jury's question with a pinpoint instruction approved by both the prosecutor and Lattin's counsel. The instruction was similar to the pinpoint instruction previously requested by Lattin but with an important distinction. It stated an assault is not committed by *merely* pointing an unloaded gun in a threatening manner:

> "An assault is not committed by a person merely pointing an unloaded gun in a threatening matter [*sic*] at another person. The present ability aspect of the crime of assault with a firearm is satisfied when a defendant has attained the means and location to strike immediately. In this context immediately does not mean instantaneously. It simply means that the defendant must have the ability to inflict injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that the injury would not be immediate in the strictest sense of that term."

After receiving the trial court's response, the jury sent a second note to state they were still confused and seeking further clarification: "We are confused by last answer: shotgun shells are required for assault with a firearm? Yes or no[?]" With both counsels' agreement, the court told the jury to "[r]efer to instruction 875 and the response the court provided to the first question."[8]

8    In a third note, the jury requested the "[d]efinition of assault," and asked, "is psychological/mental force equal to force of hitting or making

17

B.    *Governing Law*

Section 240 defines assault to be "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) "[T]he present ability element of assault . . . is satisfied when 'a defendant has attained the means and location to strike immediately.' " (*People v. Chance* (2008) 44 Cal.4th 1164, 1167–1168 (*Chance*).) As explained by our high court, "[i]n this context . . . 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion." (*Id.* at p. 1168.)

The present ability element of assault is assessed on a continuum. "Time is a continuum of which 'present' is a part. 'Present' can denote 'immediate' or a point near 'immediate.' " (*People v. Ranson* (1974) 40 Cal.App.3d 317, 321 (*Ranson*).) "Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury . . . so that injury would not be 'immediate,' in the strictest sense of that term." (*Chance, supra,* 44 Cal.4th at p. 1168.)

In *People v. Simpson* (1933) 134 Cal.App. 646, 650 (*Simpson*), for example, the court concluded the defendant had the present ability to inflict injury with a rifle that was loaded but still one step away from being ready to fire. The rifle had 10 loaded cartridges in the magazine, but an empty firing chamber. As a consequence, the defendant had to "first transfer[ ] a cartridge to the firing chamber by the operation of a lever" in order to fire it. (*Id.* at pp. 647–648.) The court concluded it would be unreasonable to find the defendant did not have the present ability to injure, just as it would be unreasonable to find "that an assailant ha[d] not the present ability to

contact?" With both counsels' approval, the trial court referred the jury to CALCRIM Nos. 252 [union of act and intent], 875, and 915 [simple assault].

18

commit a violent injury upon the person of another by means of a sword or dagger because it [was] necessary to first withdraw the weapon from a scabbard which hangs by his side." (*Id.* at pp. 651–652.)

In *Chance*, our high court concluded the defendant had the "present ability" to inflict injury under circumstances slightly more removed on the continuum. In addition to having rounds in the magazine but none in the firing chamber, the defendant pointed the gun in the wrong direction, away from his target, a police officer who was chasing after him. As the Court explained, "when a defendant equips and positions himself to carry out a battery, he has the 'present ability' required by section 240 if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Chance, supra,* 44 Cal.4th at p. 1172.)

One step further removed from immediate, in *Ranson*, cited with approval in *Chance,* the defendant aimed a rifle at a police car. (*Ranson, supra,* 40 Cal.App.3d at p. 319; see *Chance, supra,* 44 Cal.4th at p. 1172.) After the police shot and disarmed the defendant, they discovered there was no round in the chamber of his rifle because a cartridge in the magazine had jammed. (*Ranson,* at pp. 319–320.) The *Ranson* court nonetheless held the "present ability" element for an assault was satisfied under the "unique fact situation" presented there: "The rifle held by [defendant] was definitely loaded and operable; however, the top cartridge that was to be fired was at an angle that caused the gun to jam. There was evidence from which the trial court could infer that appellant knew how to take off and rapidly reinsert the clip." (*Id.* at p. 321.) Thus, even though the defendant in *Ranson* would have had to remove the clip from the gun, dislodge a jammed cartridge, reinsert the clip, chamber a round, point the

19

weapon and pull the trigger, the *Ranson* court concluded "present ability" existed. (*Ibid.* ["We are slightly more removed from 'immediate' in the instant case; however, we hold that the conduct of appellant is near enough to constitute 'present' ability for the purpose of an assault"].)

Extending the logic and holdings of *Simpson, Chance,* and *Ranson*, we disagree with Lattin and conclude there is no brightline rule in California that a gun must be loaded to commit an assault unless it is used as a club or bludgeon. It is not the case that assault by shooting can never be committed with an unloaded gun as a matter of law. If ammunition is readily available, it is a question for the jury whether a defendant with an unloaded gun possesses the means to load it and shoot immediately, or whether he is too many steps away from actually inflicting injury to have the present ability to commit assault.

Here, for example, the jury was entitled to credit Detective Page, the prosecution's gun expert, and conclude that even if Lattin's shotgun was unloaded when he aimed it at the various witnesses at various points in time, if he had cartridges with him, he would have had the ability to load the shotgun and rack it in "a second or two." Based on this expert testimony, it would appear Lattin could have loaded his weapon and prepared to fire it in far less time than the defendant in *Ranson*. (See *Ranson, supra,* 40 Cal.App.3d at p. 321.)

Lattin contends a long line of California cases hold otherwise. We do not agree. It is true there are many cases, including from the California Supreme Court, which state without qualification that "[t]he threat to shoot with an unloaded gun is not an assault, since the defendant lacks the present ability to commit violent injury." (See e.g., *People v. Fain* (1983) 34 Cal.3d 350, 357, fn. 6 (*Fain*); *People v. Wolcott* (1983) 34 Cal.3d 92, 99; *People v.*

20

*Sylva* (1904) 143 Cal. 62, 65 (*Sylva*); *People v. Miceli* (2002) 104 Cal.App.4th 256, 269; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 542, fn. 10 (*Lochtefeld*); *People v. Bekele* (1995) 33 Cal.App.4th 1457, 1463, disapproved on another point in *People v. Rodriguez* (1999) 20 Cal.4th 1, 13–14 (*Rodriguez*); *People v. Valdez* (1985) 175 Cal.App.3d 103, 111; *People v. Orr* (1974) 43 Cal.App.3d 666, 672; *People v. Mosqueda* (1970) 5 Cal.App.3d 540, 544; *People v. Mearse* (1949) 93 Cal.App.2d 834, 836; *People v. Montgomery* (1911) 15 Cal.App. 315.) " ' "It is axiomatic," ' " however, " ' "that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered." ' " (*People v. Knoller* (2007) 41 Cal.4th 139, 154–155.) We have not found a single case that considered facts like those presented here—where there was evidence a firearm was unloaded but ammunition was immediately available to the defendant for loading within seconds—and then specifically considered whether such facts could support a finding of present ability.

This includes the venerable opinion, *People v. Lee Kong* (1892) 95 Cal. 666 (*Lee Kong*). *Lee Kong* is often cited (without analysis) as the original source for Lattin's suggested brightline rule. (E.g., *Fain, supra,* 34 Cal.3d at p. 357, fn. 6.) But we do not read *Lee Kong* to have such a broad holding.

The defendant in *Lee Kong* was believed by police to be running an illegal "gambling or lottery game." (*Lee Kong, supra,* 95 Cal. at p. 667.) A policeman "secretly bored a hole in the roof of [the defendant's] building" to spy on him. The defendant learned he was being observed, and he shot a *loaded* pistol at the spot where he thought the policeman was watching. The defendant's "aim was good, for the bullet passed through the roof at the point intended; but very fortunately for the officer of the law, at the moment of

21

attack he was upon the roof at a different spot." (*Ibid*.) At that different spot, the officer was able to observe the defendant try and shoot him. (*Id*. at pp. 667–668.)

The *Lee Kong* court considered whether the elements of assault could be satisfied by this fact pattern. (*Lee Kong, supra*, 95 Cal. at p. 668.) As a first step in its analysis, the Court considered which line of authority to follow in an entrenched split on the definition of assault. (*Id*. at pp. 668–669.) "In the early law, the word 'assault' represented an entirely different concept in criminal law than it did in the law of torts. As an offense it was an attempt to commit a battery; as a basis for a civil action for damages it was an intentional act wrongfully placing another in apprehension of receiving an immediate battery." (Perkins & Boyce, Criminal Law (3d ed. 1982) Assault, ch. 2, § 2(B)(1), p. 159.) The first type of assault usually requires "that the assaulter have a 'present ability' to commit a battery." (2 LaFave, Substantive Criminal Law (3d ed. 2018), § 16.3(a), p. 771 (LaFave).) The second type of assault does not. (*Id., §* 16.3(b), p. 772.)

Most states over time expanded the definition of criminal assault to include "the intent-to-frighten type of assault." (LaFave*, supra*, § 16.3, p. 769.) The *Lee Kong* court held that California is not one of these states. (*Lee Kong, supra*, 95 Cal. at pp. 668–669.) In California, section 240 specifically defines assault to be "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." Therefore, "[i]n order to constitute an assault there must be something more than a mere menace. There must be violence begun to be executed." (*People v. Yslas* (1865) 27 Cal. 630, 633.) In coming to this conclusion, the *Lee Kong* court considered case law in other jurisdictions that addressed whether an assault can be committed with an unloaded gun. Important here, the Court

22

considered these cases in the abstract.  The defendant in *Lee Kong* successfully shot a loaded gun through his roof.  (*Lee Kong, supra*, 95 Cal. at p. 667.)  The case did not involve an unloaded gun.

The *Lee Kong* court explained its decision to reject the "principally English" line of authority that defines criminal assault to include "the intent-to-frighten type of assault" by comparing the outcomes in cases involving unloaded guns in both English and United States common law jurisdictions.  (*Lee Kong, supra*, 95 Cal. at p. 669; LaFave*, supra*, § 16.3, p. 769.)  The Court stated it could not endorse those authorities that hold "an assault may be committed by a person pointing in a threatening manner an unloaded gun at another" *if the "party at whom it was menacingly pointed was thereby placed in great fear*."  (*Lee Kong,* at p. 669, italics added.)  The Court reasoned, "[u]nder our statute it cannot be said that a person with an unloaded gun would have the present ability to inflict an injury upon another many yards distant, *however apparent and unlawful his attempt to do so might be*."  (*Ibid.,* italics added.)

Read in context, we do not view these statements as a holding that assault can never be committed with an unloaded gun if a person is too far away to use it as a club or bludgeon.  That question was not before the *Lee Kong* court.  The question before the Court was which line of authority to follow as a general proposition, the line of authority that required present ability to inflict injury, or the line of authority that defined assault to include an intentional act wrongfully placing another in apprehension of an immediate battery.  (*Lee Kong, supra*, 95 Cal. at pp. 668–669.)  The statements therefore constitute a holding only to the extent the Court decided the definition of assault in California follows the first line of authority and not the second, nothing more.

Having determined a criminal assault in California does not include the traditional tort law concept of the offense, the *Lee Kong* court turned to the more specific question raised on appeal by the defendant. The defendant contended the evidence was insufficient to support the verdict, because his "mistake as to the policeman's exact location upon the roof" meant he did not have the present ability to inflict injury. (*Lee Kong, supra*, 95 Cal. at p. 670.) Foreshadowing *Chance*, the Court decided the policeman "was sufficiently near to be killed from a bullet from the pistol," and the fact that the defendant "was mistaken in judgment as to the exact spot where his intended victim was located [was] immaterial." (*Ibid.*) We see no conflict with this holding in *Lee Kong* and our holding here.

Also important, *Lee Kong* is a case from another era, one where Lattin's fast-loading, pump-action shotgun would be science fiction. The out-of-state cases that were discussed by the Court illustrate this point. All involved firearms that had to be separately loaded with gunpowder and ammunition. In *State v. Napper* (1870) 6 Nev. 113, 115–116, the element of present ability depended on whether the defendant's pistol was unloaded or "loaded with gunpowder and leaden bullets." In *State v. Swails* (1856) 8 Ind. 524, 524–525, disapproved in *Kunkle v. State* (1869) 32 Ind. 220, 230, present ability depended on whether the defendant's gun was loaded with "powder and a light cotton wad" or "powder and ball." And in *Kunkle, supra*, at pp. 225–227, present ability depended on whether the defendant's gun was "lightly loaded" with "common squirrel shot." After reviewing these cases, we observe that what may have been unimaginable in 1892 (when *Lee Kong* was decided)— that a gun could be loaded and made ready to fire in one or two seconds—is no longer the case today.

24

For all these reasons, we understand the line of authority cited by Lattin to hold that menacing a person with an unloaded gun and the apparent ability to inflict injury—*by itself*—is not enough to commit criminal assault. (*Lee Kong, supra*, 95 Cal. at p. 669.) Under the right circumstances, proof that a firearm was unloaded can be a complete defense to charges of assault. (*Sylva, supra*, 143 Cal. at p. 65.) But it is not a complete defense in all circumstances as a matter of law. (See *Chance, supra*, 44 Cal.4th at p. 1172; *Ranson, supra*, 40 Cal.App.3d at p. 321; *Simpson, supra*, 134 Cal.App. at p. 650.) We thus agree with the trial court that assault with a firearm can be committed with an unloaded gun by a defendant who has ammunition available and the means to load it immediately.

C.  *Lattin Was Not Entitled to the Pinpoint Instruction He Drafted*

As noted, Lattin asked the trial court to instruct the jury that assault with a firearm cannot be committed with an unloaded gun unless it is used as a club or bludgeon, and to explain that the present ability element of assault is assessed on a continuum. The trial court correctly refused the instruction as drafted.

Pinpoint instructions on the defense theory of the case are required upon request "when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*People v. Bolden* (2002) 29 Cal.4th 515, 558–559 (*Bolden*).) "A pinpoint instruction relates specific evidence to the elements of the offense, highlighting a defense theory." (*People v. Grassini* (2003) 113 Cal.App.4th 765, 777.) "Specifically, a criminal defendant 'is entitled to an instruction that focuses the jury's attention on facts relevant to its determination of the existence of reasonable doubt.' " (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 856–857.) Pinpoint instructions are required to be given only if they are supported by

substantial evidence, and "only when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*Bolden, supra*, at pp. 558–559; see generally, *People v. Mathews* (1994) 25 Cal.App.4th 89, 98–100.)

Here, as noted, the prosecution's theory of the case was the shotgun was either loaded, or if not loaded, Lattin had ammunition readily available and could load it within seconds. Detective Page explained the shotgun could be loaded in "less than a second," and loaded and racked in "a second or two." Witnesses saw Lattin hand the shotgun to his friends in the black Mazda, and police found not only the shotgun but also three "compatible" live cartridges in that car. Accordingly, there was circumstantial evidence that Lattin had three live cartridges on his person—either in a pocket or contained in the fabric cartridge holder attached to the shotgun's folding stock—and that this gave him the ability to swiftly load and shoot his modern-day weapon as he pointed it at Michael.

Against this evidence, the defense theory was "there was no evidence that the [shot]gun was loaded or was ever even near any shotgun shells." In support of his defense, Lattin testified he made sure the shotgun was unloaded and he did not recall having any shells with him. If a jury found both facts to be true, the element of present ability would have been unsatisfied. (See *Sylva, supra*, 143 Cal. at p. 65; *Chance, supra*, 44 Cal.4th at pp. 1172, 1176.) It was essential therefore to tell jurors how to assess the element of present ability in light of conflicting evidence that the shotgun may or may not have been unloaded and Lattin may or may not have had the means to quickly load it.

The instructions on present ability were deficient. (*Bolden, supra*, 29 Cal.4th at pp. 558–559.) They told the jury only that Lattin had to have the "present ability" to apply force with a firearm to a person "when [he] acted" in order to commit an assault. They did not explain that pointing an unloaded gun at a person is not an assault unless the present ability element is satisfied in another manner. Nor did they address the legal principle that "when a defendant equips and positions himself to carry out a battery, he has the 'present ability' required [to commit an assault] if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken, and even if the victim or the surrounding circumstances thwart the infliction of injury." (*Chance, supra*, 44 Cal.4th at p. 1172.) The jury needed this additional information about the present ability element to fairly assess Lattin's defense. Telling jurors that Lattin had to have the "present ability" to apply force "when [he] acted," and nothing more, left them without a link between the evidence at trial and essential legal principles they needed to resolve this question. Lattin thus established he was entitled to a pinpoint instruction on these points.

Under the circumstances, however, it would have been inaccurate to tell the jury there could be no assault as a matter of law if Lattin's gun were unloaded, which is what the instruction he drafted conveyed. As we have explained, an unloaded gun can be used to commit assault with a firearm by a defendant who has the means and ammunition available to load it immediately. And here, there was ample evidence in the record to support a conviction on this theory. Lattin's requested instruction, consequently, did not accurately pin the evidence adduced at trial to the present ability element of assault. The trial court correctly refrained from using it to instruct the jury.

27

In coming to this conclusion, we considered *Sylva, supra*, 143 Cal. 62, not cited by either party. In *Sylva*, the defendant pointed a gun at the complaining witness from over 15 feet away and said, " 'I will shoot you if you don't get out of the house.' " (*Id.* at p. 63.) The defendant did not threaten or attempt to use the gun as a weapon in any other manner, and ultimately "it was not in fact fired." (*Ibid.*) These basic facts were uncontested. (*Ibid.*) But there was a "serious dispute" at trial as to "whether or not the gun was loaded." (*Ibid.*)

The defendant in *Sylva* asked the trial court to give a pinpoint instruction to the jury on the element of present ability using language analytically indistinguishable from the instruction requested by Lattin: " '[1.] A person with an unloaded gun does not have the present ability to inflict an injury upon another many yards distant, however apparent and unlawful his attempt to do so might be,' " and " '[2.] An assault cannot be committed by a person pointing in a threatening manner an unloaded gun at another, and this, too, regardless of the fact whether the party holding the gun thought it was loaded, or whether the party at whom it was menacingly pointed was thereby placed in great fear.' " (*Sylva, supra*, 143 Cal. at p. 64.) The trial court denied the defendant's request. (*Ibid.*)

Following the rules for assessing the need for pinpoint instructions, the *Sylva* court reviewed the other instructions that had been given to the jury. (*Sylva, supra*, 143 Cal. at p. 65.) The Court determined the other instructions "correctly defined the respective crimes of assault and assault with a deadly weapon." (*Id.* at p. 64.) However, "[i]*n view of the state of the evidence*," the Court determined the instructions were "ambiguous" based on the fact pattern presented there, and "so conflicting that they might have

28

misled the jury" on the question of whether an assault could be committed with an unloaded gun. (*Id.* at pp. 64–65, italics added.)

The *Sylva* court held that "[*u*]*nder these circumstances* it must be conceded that if the gun was not loaded there was no assault, either with a deadly weapon or otherwise. Pointing an unloaded gun at another, accompanied by a threat to discharge it without any attempt to use it, except by shooting, does not constitute an assault. There is in such a case no present ability to commit a violent injury on the person threatened, in the manner in which the injury is attempted to be committed." (*Sylva, supra,* 143 Cal. at p. 64, italics added.) The Court explained that, "[i]n view of [the other] ambiguous instructions, the [trial] court should have given the instructions asked by the defendant. . . . The *only* serious dispute being whether or not the gun was loaded, the defendant was entitled to an instruction upon that precise point." (*Id.* at p. 65, italics added.)

Despite obvious similarities, we conclude *Sylva* does not control the resolution of the distinct issue presented here. It is true the principal pinpoint instruction requested by Lattin closely tracked the instruction requested in *Sylva.* It is also true, exactly as was the case in *Sylva*, there was a serious dispute as to whether the gun was loaded in the instant case. But the circumstances in dispute here were different from those in *Sylva* in one crucial respect. Unlike *Sylva,* there was evidence here to support more than one prosecution theory on the question of present ability. Like *Sylva*, there was evidence the gun was loaded. However, unlike *Sylva*, if the jury did not believe the shotgun was loaded, there was evidence Lattin had ammunition with him and could load the shotgun in seconds. We therefore find the holding in *Sylva* to be inapposite.

29

To be clear, we do not disagree with the holding in *Sylva* that the instruction requested there was necessary and that it accurately pinned the evidence to the law based on the specific circumstances and the instructions that were given to the jury in that case. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We are distinguishing *Sylva*. Ours is not a case, like *Sylva*, where there was no evidence of ammunition readily available to the defendant at the location of the alleged assault.

Finally, we observe that, although the trial court correctly refused Lattin's pinpoint instruction *as drafted*, it may have erred when it rejected the requested instruction outright instead of correcting it and tailoring it to the particular facts of the case. (*People v. Hall* (1980) 28 Cal.3d 143, 158–159 ["Although the trial court did not err in refusing to give the [pinpoint] instruction as written, it should not have refused to tailor the instruction to the facts of this case."], overruled on another point in *People v. Newman* (1999) 21 Cal.4th 413, 415; but see *People v. Gonzalez* (1992) 8 Cal.App.4th 1658, 1663–1664 [no duty to correct seriously flawed instruction].) Although Lattin's pinpoint instruction was inapt as drafted, this does not necessarily mean he was not entitled to have the jury provided with additional instruction. (See *Falsetta, supra*, 21 Cal.4th at pp. 923–924 [concluding that it was error to fail to instruct the jury with the correct portion of an otherwise faulty limiting instruction]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1110 [concluding that to the extent defendant's proposed pinpoint instruction was argumentative, "the trial court should have tailored the instruction to conform to the requirements [of the law], rather than deny the instruction outright"]; cf. *People v. Bolden* (1990) 217 Cal.App.3d 1591, 1597 [concluding that although defendant's proposed instruction on the defense theory of the

case incorrectly stated the law, "this alone does not support the trial court's refusal to properly instruct"].)

We need not decide this question though. Even if the trial court was required to correct and tailor Lattin's proposed instruction to the particular facts of the case prior to jury deliberations, we would conclude any error was harmless, under any standard. (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818, 836.) This is because the trial court correctly instructed the jury with a revised pinpoint instruction in response to its questions during deliberations about the present ability element.

D. *Harmless Error*

The trial court's revised instruction tracked the instruction that Lattin had originally proposed, but with a key modification. Instead of telling the jury, as Lattin had requested, that "an assault is not committed by a person here by pointing an unloaded gun in a threatening manner [at] another person," the court used language from two recent California Supreme Court cases and instructed the jury that "[a]n assault is not committed by a person *merely* pointing an unloaded gun in a threatening matter [*sic*] at another person." (Italics added.) (See *Rodriguez, supra*, 20 Cal.4th at p. 11, fn. 3; *People v. Penunuri* (2018) 5 Cal.5th 126, 147 (*Penunuri*).) This small but key revision properly told jurors that pointing an unloaded gun at a person in a threatening manner is not—*by itself*—an assault, and that something more is required.

Using language direct from our high court (see *Chance, supra*, 44 Cal.4th at p. 1168), the rest of the revised instruction told the jury the "more" that was required:

> "The present ability aspect of the crime of assault with a firearm is satisfied when a defendant has attained the means and location to strike immediately. In this context immediately does

31

not mean instantaneously. It simply means that the defendant must have the ability to inflict injury on the present occasion. Numerous California cases establish that an assault may be committed even if the defendant is several steps away from actually inflicting injury, or if the victim is in a protected position so that the injury would not be immediate in the strictest sense of that term."

With this additional portion of the revised instruction, the jury had the information it needed to decide whether Lattin had the present ability to commit an assault even if the gun was not loaded. The instruction correctly conveyed they could convict only if Lattin had "immediate" access to the ammunition and only if they believed the procedure required to load the gun placed him no more than "several steps away from actually inflicting injury." So the jury was correctly instructed before it completed its deliberations with the legal principles it needed to focus its attention on the defense theory of the case. Any error by the trial court was therefore harmless.

II.

*No Reversal for Insufficient Evidence*

After the close of evidence, Lattin moved to dismiss the case pursuant to section 1118.1. He contends the trial court erred when it denied his motion with respect to the present ability element of the assault with a firearm conviction. He claims the motion should have been granted "because the shotgun was unloaded and it was not used as a club." (Capitalization omitted.) We disagree. The record contained substantial evidence Lattin had the present ability to apply force with a firearm when he aimed the shotgun at Michael after returning to the gas station and fighting with him. There was substantial evidence the shotgun was loaded at that point in time. There was also substantial evidence that, even if not loaded, Lattin had ready access to ammunition and could quickly load it.

32

"An appellate court reviews the denial of a section 1118.1 motion under the standard employed in reviewing the sufficiency of the evidence to support a conviction." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) Under that standard, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 (*Jackson*); *People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6.) Our task is "to determine whether [the record] contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) A reversal for insufficient evidence " 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Substantial evidence supported the prosecution's primary theory that the shotgun was loaded when Lattin returned to the gas station and pointed it at Michael. "California courts have often held that a defendant's statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon was loaded." (*Rodriguez, supra*, 20 Cal.4th at p. 12.) All four victims testified Lattin threatened to kill them while he was pointing the shotgun at them during the first encounter at the gas station. A jury could reasonably have interpreted Lattin's threats to kill the victims to be an admission the weapon was loaded. They could have resolved conflicting evidence in favor of concluding the shotgun remained loaded throughout the second encounter until Lattin or his friends emptied it before placing it in the trunk of the black Mazda. (See *Lochtefeld, supra*,

33

77 Cal.App.4th at pp. 536, 541–542 [the defendant's "own words and actions, in both verbally threatening and in displaying and aiming the gun at others" supported the jury's determination the gun was loaded and "sufficiently operable"].)

There was also circumstantial evidence that Lattin's friends and wife spoke to Lattin while he was away from the gas station and learned the shotgun was loaded and he intended to use it. They were so alarmed they used two vehicles to follow him back to the gas station. Then, when they saw him pointing the shotgun at Michael, they implored him not to fire, specifically telling him "not to shoot and don't do it." The fact that a firearm was loaded may be inferred from circumstantial evidence, and "we will uphold an assault conviction if the inference is reasonable." (*Penunuri, supra*, 5 Cal.5th at p. 147.)

To be sure, there was countervailing evidence the shotgun was not loaded. It was unloaded when it was found by deputies. Jz.R. and An.D. testified that Lattin racked the weapon more than once during the second incident and saw no shells come out. Michael's testimony he saw an orange shell expelled from the shotgun onto Lattin's car floor was ambiguous as to whether Lattin was unloading the shotgun or making sure it was loaded.

Relying on this favorable evidence, Lattin argues reversal is required because the evidence the shotgun was loaded was "weak." He is mistaken about the nature of our review for substantial evidence. As noted, we review the evidence "in the light most favorable to the prosecution," not the light most favorable to the appellant. (*Jackson, supra*, 443 U.S. at p. 319.) We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. (*Albillar, supra*, 51 Cal.4th at p. 60.) We do not reweigh the evidence or reassess the credibility of witnesses.

34

(*Ibid.*)  Therefore, "[i]f the circumstances reasonably justify the trier of fact's findings," as was the case here, "reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*Ibid.*)  Applying the correct standard, the evidence the shotgun was loaded was sufficient to support the assault with a firearm conviction.

Regardless, substantial evidence supported the prosecution's alternate theory that Lattin had the means to quickly load the shotgun.  As we concluded earlier, there is no brightline rule in California that a gun must be loaded for a defendant to have the present ability to commit assault with a firearm by pointing it at someone.  The jury could have found beyond a reasonable doubt that Lattin had ammunition readily available and was capable of loading and racking the shotgun "immediately" in the sense that he had "the ability to inflict injury on the present occasion," even if he was "several steps away from actually inflicting injury."  (*Chance, supra*, 44 Cal.4th at pp. 1167–1168.)

Detective Page testified that a person "competent with th[e] weapon system" could load and rack the shotgun in "a second or two."  The evidence presented at trial showed Lattin was familiar with his shotgun; he repeatedly racked and pumped it during the encounters.  There were no shells found anywhere at the scene except in the cupholder of the black Mazda, supporting the reasonable inference that Lattin had the shells in his pocket or the fabric cartridge holder when he pointed the shotgun at Michael and that he gave them to his friends when he gave them the shotgun before the deputies arrived.  This evidence was more than sufficient to support a finding beyond a reasonable doubt that Lattin had the present ability to commit an assault with a firearm.

## III.

### *No Error Admitting Prior Testimony by Unavailable Witnesses*

Lattin contends the trial court erred when it ruled that Joshua and Trayshawn were unavailable witnesses within the meaning of Evidence Code section 240 and allowed their prior trial testimony to be read into the record. The two witnesses testified at the first trial, but the People were unable to locate them and subpoena them to testify at the second trial. Our review of the trial court's ruling that the witnesses were unavailable is de novo, but "we defer to the trial court's determination of historical facts supported by substantial evidence." (*People v. Wilson* (2021) 11 Cal.5th 259, 291 (*Wilson I*).) Lattin's contention has no merit.

A criminal defendant has the right to confront the witnesses against him under both our state and federal constitutions. (U.S. Const., 6th Amend.; Cal. Const., art. 1, § 15; *People v. Wilson* (2005) 36 Cal.4th 309, 340 (*Wilson II*).) "This right, however, is not absolute." (*Wilson II, supra*, at p. 340.) "If a witness is unavailable but ha[s] previously testified against the defendant and was subject to cross-examination at that time, that prior testimony may be admitted." (*Wilson I, supra*, 11 Cal.5th at pp. 289–290.) Both conditions must be met, however, and there are no other exceptions to a defendant's "right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.; see *Crawford v. Washington* (2004) 541 U.S. 36, 59.)

Relevant here, a witness who is absent from a trial is " 'unavailable' " in the constitutional sense only if the prosecution has made a "good-faith effort" to obtain the witness's presence at the trial. (*Barber v. Page* (1968) 390 U.S. 719, 724–725.) To establish good faith, " '[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable

36

despite good-faith efforts undertaken prior to trial to locate and present that witness." (*Ohio v. Roberts* (1980) 448 U.S. 56, 74, disapproved on another point in *Crawford v. Washington, supra*, 541 U.S. at pp. 60–68.)

The federal requirements of good faith and reasonableness are coextensive with California state law definitions. (*People v. Herrera* (2010) 49 Cal.4th 613, 621–622.) In particular, Evidence Code section 240, subdivision (a)(5), provides a declarant is " 'unavailable as a witness' " if the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." Relevant considerations for determining whether reasonable diligence has been exercised are "the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored." (*Wilson II*, *supra*, 36 Cal.4th at p. 341.)

The trial court here conducted an evidentiary hearing to determine whether Joshua and Trayshawn were unavailable. At the conclusion of the hearing, the trial court found both witnesses were unavailable and allowed their prior testimony to be read into the record. Based on our independent review, the court's ruling was resoundingly supported by the record.

Detective George Lozano, a senior investigator with the San Bernardino County Sheriff's Department, was asked to locate the two witnesses 11 days before trial commenced on February 27, 2023. Lozano personally spent 60 hours looking for the missing witnesses.

Lozano checked multiple law enforcement databases that compile address, employment, and phone number information for people living in Southern California and Las Vegas. He checked the California Department of Motor Vehicles website. He checked the county jail databases to see

37

whether they were in custody in Riverside County, San Bernardino County, or Orange County. He checked the witnesses' "employment status through the California . . . equal employment division." He "checked both of their previous work location[s]," but learned "they were let go back in August." He ran the license plates of vehicles registered to both witnesses to see whether "those vehicles hit cameras in the area of this current address or any other associated address which [was] known," but "[t]he last hit for each vehicle for each subject [was] months ago." He called phone numbers of friends and family members associated with the witnesses and left messages. He "did a social media search to see if there [was] anything . . . to show a current location of each subject." He checked the state's welfare database to see if either witness was receiving benefits at a current address. He checked the local school district to see if either witness had children in school.

Lozano went in person to each last known address he found for each missing witness and "knocked on the doors, left copies of subpoenas, business cards, [and] spoke to neighbors." He went to the current listed addresses for the witnesses' spouses and other family members and spoke to them or to the new tenants at those addresses unless "they would not talk to [him] at all because [he] was in law enforcement." With help from five other investigators from the Bureau of Investigation of the San Bernardino County District Attorney's office, he "conducted surveillance on different dates and different times—sometimes in the morning, sometimes in the afternoon, sometimes in the evening—to see if [he] could catch them at home or going." On cross-examination, Lozano made one minor admission: He did not check "the voter rolls."

Lozano initially did not contact the victims, Jz.R., Michael, An.D., and Anthony, because the Sheriff Department's policy is to not "ask other victims

or witnesses where witnesses are at because [that] could lead to dissuading, and . . . a whole other batch of problems that we don't want to deal with." But on the fifth day of trial, the trial court ordered him to contact the victims and he did. Lozano learned that none of the victims had spoken with either missing witness "since the time of the incident."

The instant case is nothing like the cases relied upon by Lattin. In *People v. Sanders* (1995) 11 Cal.4th 475, 524, "the defense made no effort what[so]ever" to subpoena a missing witness "until well into the trial" and "[e]ven then, belated efforts to locate her were minimal, consisting of a single phone call to her former work number and several visits to her former address." In *People v. Avila* (2005) 131 Cal.App.4th 163, 170, the prosecution's investigator waited "until the '11th hour'" on "the morning trial started" to contact a critical witness. In *People v. Pitts* (1990) 223 Cal.App.3d 1547, 1557, the investigator failed to start looking for a witness until "just before trial," failed to search for the witness using all his known aliases, and failed to contact his former probation officers to see if they knew his whereabouts.

By contrast, this case is on all fours with *People v. Fuiava* (2012) 53 Cal.4th 622. There, our high court found a remarkably similar search to be reasonable. The search included database research, interviews of neighbors and family members, and in-person visits to investigate various leads. It also commenced approximately two weeks before trial, just like the case here. (*Id.* at pp. 675–677.)

Lattin argues a higher level of diligence was warranted because Joshua and Trayshawn were important witnesses and the prosecution knew they were reluctant to testify. We agree with the People that the testimony of these two witnesses was not critical to the prosecution's case. Trayshawn did

39

not remember whether Lattin pointed the shotgun at anyone other than himself. Joshua "didn't physically see the gun [him]self" and only heard people yelling about it. Neither witness was substantially less biased than the prosecution's four other witnesses, who considered them to be family friends. Jz.R. and Anthony even referred to Joshua and Trayshawn as their "uncle[s]." To the extent their testimony was helpful to the prosecution, it was cumulative to the testimony of the prosecution's other four percipient witnesses. To the extent their testimony was important to the defense, Lattin could have undertaken an extra effort to keep track of them to call them as his own witnesses.

Finally, while there was evidence Joshua and Trayshawn were reluctant witnesses, there is nothing in the record to indicate there was a substantial risk they would flee. The prosecution is not required "to keep 'periodic tabs' on every material witness in a criminal case." (*People v. Hovey* (1988) 44 Cal.3d 543, 564.) The prosecution is also not required, "absent knowledge of a 'substantial risk that [an] important witness [will] flee,' to 'take adequate preventative measures' to stop the witness from disappearing." (*Wilson II*, *supra*, 36 Cal.4th at p. 342, quoting *Hovey, supra*, at p. 564.)

Under the circumstances, the prosecution exercised reasonable diligence in its attempts to locate Joshua and Trayshawn. We agree with the trial court that they were unavailable within the meaning of Evidence Code section 240 and their prior testimony was properly admitted into evidence.

IV.

*No Error Admitting Evidence That "Peckerwood" Is a Gang*

Lattin contends the trial court abused its discretion under Evidence Code section 352 and violated principles of collateral estoppel when it allowed

40

a prosecution expert to tell the jury that "Peckerwood" is the name of a white supremacist prison gang. There is no merit to this claim.

All four victims testified that Lattin said he was from Peckerwood when he initially walked out of the market and threatened them. Jz.R. testified she did not know the meaning of Peckerwood at the time, but learned later that it is the name of a gang. Michael thought Peckerwood was a gang from Los Angeles. An.D. testified she understood Peckerwood to be a white supremacist gang, "[t]he second thing to KKK."[9]

In addition to this testimony, Detective Jared Sacapano, a gang officer with the San Bernardino County Sheriff's Department, testified as an expert. According to Sacapano, "the term 'Peckerwood' was . . . a derogatory term used back in the 1800's" to describe "a poor white person." In the 1950s, the term was adopted by white inmates involved in gang activity in the California prison system. Today, the term "Peckerwood" is now used in both "custodial and street setting[s]," typically but not always by "a white gang member." Significantly, Sacapano testified he was not offering an opinion that Lattin was a Peckerwood gang member or a white supremacist.

The trial court gave this limiting instruction about the evidence:

"During the trial, testimony from Detective Sacapano was admitted for a limited purpose, specifically to explain the context of the term 'Peckerwood.' You may consider that evidence only for that purpose and for no other."

Evidentiary decisions by the trial court are reviewed for abuse of discretion. (*People v. Parker* (2022) 13 Cal.5th 1, 53.) They will be reversed only if we conclude that the trial court exercised its discretion in an arbitrary,

---

[9]    Detective Page testified he was the person who told An.D. that the term "Peckerwood" refers to a "white supremacist type of group," and that he did this when he was interviewing her after deputies arrived at the gas station.

capricious or patently absurd manner that resulted in a miscarriage of justice. (*Ibid.*) Applying this standard, we find no evidentiary error.

The evidence was relevant. (Evid. Code, § 350.) The prosecution's theory for motive was racial animus. No matter whether Lattin was a gang member or not, there was evidence he claimed he was "from Peckerwood" during the first confrontation at the gas station. If credited as true, it would be reasonable to infer from this evidence that Lattin threatened and pointed the shotgun at the victims because he perceived them to be African American. Expert testimony that "Peckerwood" is the name of a white supremacist gang was therefore relevant to Lattin's motive and intent. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1050–1051 (*Hernandez*).)

The evidence was not unduly prejudicial. (Evid. Code, § 352.) In addition to claiming he was from Peckerwood, Lattin engaged in a vile rant laced with racial slurs culminating in a threat to lynch the victims. The statement he was from Peckerwood was "no more inflammatory" than the rest of his racist invective. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

Unlike the cases relied upon by Lattin, moreover, Detective Sacapano made it very clear he offered no opinion as to whether Lattin was a member of the Peckerwood gang or was a white supremacist, and he provided no details about Peckerwood's criminal activities. (Compare, e.g., *Hernandez, supra*, 33 Cal.4th at pp. 1045–1046; *People v. Albarran* (2007) 149 Cal.App.4th 214, 227–228.) The limiting instruction to the jury also prohibited them from using his testimony to draw that impermissible inference.

The fact is there was evidence Lattin said he was "from Peckerwood" *while he was walking to his car to take out his shotgun*. The evidence was therefore highly relevant on the question of what he was thinking at that

42

time, in particular, what motivated him to retrieve the shotgun and whether he planned to commit an assault. We are not persuaded there was a compelling reason to partially sanitize what he said by refraining from telling the jury what "Peckerwood" meant, much less an abuse of discretion to allow the prosecution the opportunity to provide the jury with this information.

The evidence also was not barred by the doctrine of collateral estoppel. We review questions involving collateral estoppel de novo. (*Jenkins v. County of Riverside* (2006) 138 Cal.App.4th 593, 618.) Collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." (*Ashe v. Swenson* (1970) 397 U.S. 436, 443.) In general, collateral estoppel applies " 'if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial.' " (*People v. Santamaria* (1994) 8 Cal.4th 903, 916 (*Santamaria*).)

As we understand his argument, Lattin contends the prosecution was collaterally estopped from retrying the underlying case on the theory that Lattin was motivated by racial hostility. This is because (1) the jury in the first trial found the hate crime enhancements that were alleged there to be "not true," and (2) one of the elements of a hate crime enhancement, which the jury necessarily found not true, is that the crime was committed based on racial animus.[10] As a consequence, according to Lattin, the issue of racial

---

[10]     Section 422.75, subdivision (a), provides for an additional term of one, two, or three years in state prison if a person commits a felony that qualifies as a "hate crime." " 'Hate crime' " is defined as a "criminal act committed, in

animus as a motivation for the crimes could not be relitigated as between the parties for a second time, and the evidence that Peckerwood was the name of a white supremacist gang was therefore not relevant to an issue in dispute during the second trial; thus it should have been excluded. Lattin's argument contains a logical flaw.

The problem with Lattin's argument is twofold. First, " 'issue preclusion in criminal cases only applies when the relevant issue is "ultimate" in the subsequent prosecution, i.e., when the issue must be proven beyond a reasonable doubt.' " (*Santamaria, supra*, 8 Cal.4th at p. 922, quoting *U.S. v. Bailin* (7th Cir. 1992) 977 F.2d 270, 280.) Motive is not an element of assault, and it is therefore not an ultimate fact that must be proven to obtain a conviction. (§ 240; see CALCRIM No. 915; *People v. Smith* (2005) 37 Cal.4th 733, 740 ["with few exceptions, motive itself is not an element of a criminal offense"].)

Second, Lattin misunderstands the implications of an acquittal in the context of collateral estoppel. The jury's "not true" finding on the hate-crime enhancement meant they had a reasonable doubt that racial animus was his motivation. It did *not* mean they found beyond a reasonable doubt that Lattin was *not* motivated by racial animus. " 'Instead of meaning that certain acts did not happen, an acquittal means that they were not proved beyond a reasonable doubt.' " (*Santamaria, supra*, 8 Cal.4th at p. 922, italics omitted, quoting *U.S. v. Seley* (9th Cir. 1992) 957 F.2d 717, 723 (*Seley*).)

These two principles are fatal to Lattin's argument. " 'If an act that could have been proved to a lesser degree than that required for conviction is for some reason probative in a subsequent trial, it need not be excluded

whole or in part, because of one or more of the following actual or perceived characteristics of the victim: . . . Race or ethnicity." (§ 422.55, subd. (a)(4).)

44

because of the prior acquittal.' " (*Santamaria, supra*, 8 Cal.4th at p. 922, quoting *Seley, supra*, 957 F.2d at p. 723.) The United States Supreme Court has specifically declined "to extend . . . the collateral-estoppel component of the Double Jeopardy Clause to exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted." (*Dowling v. United States* (1990) 493 U.S. 342, 348.) The admission of evidence to explain the meaning of the term "Peckerwood" was not barred by collateral estoppel. The trial court committed no error by admitting testimony that "Peckerwood" is the name of a white supremacist gang.

V.

*All Prosecutor Misconduct Claims Are Forfeited and Unfounded*

Lattin contends the prosecutor committed misconduct by (1) coaching prosecution witnesses, (2) misstating the law during closing argument, and (3) improperly disparaging defense counsel during closing argument. These claims are forfeited. We discuss them briefly, nevertheless, to point out that two of them are based on an unfair reading of the appellate record. The third ignores settled case law.

A.    *Allegation the Prosecutor Coached Witnesses*

During the cross-examination of Anthony, defense counsel told the trial court that Lattin had "raised a concern" with him the prosecutor "perhaps inadvertently signaled a response to his witness." Defense counsel explicitly stated he did not believe there had been "intentional misconduct by any means." Shortly thereafter, defense counsel stated a second time he was not alleging misconduct: "I want it to be crystal clear. We're not leveling any sort of misconduct allegation, whatsoever."

45

Later, during the cross-examination of An.D., Lattin, acting on his own accord, improperly spoke up and purported to lodge an objection that he "s[aw] the [prosecutor] give some kind of cue or hand signals." The court excused the jury and admonished Lattin that he was required to raise issues through the bailiff or his defense counsel. Defense counsel then stated for the third time he was not alleging prosecutor misconduct.

On this record, there is no basis for Lattin to assert prosecutor misconduct based on purported witness coaching. "[T]he lack of an objection at trial bar[s a] defendant from arguing on appeal that the prosecutor's conduct require[s] reversal of his convictions." (*People v. Lopez* (2008) 42 Cal.4th 960, 965, 971–972 (*Lopez*).) Defense counsel here specifically disavowed any claim of prosecutor misconduct—three times—with respect to potential coaching.

Lattin's personal objection was improper. It did *not* preserve the issue for review. (*Magee v. Superior Court* (1973) 34 Cal.App.3d 201, 213 (*Magee*), disapproved on other grounds, *People v. Norris* (1985) 40 Cal.3d 51, 56.) His disagreement with his counsel's trial tactics is irrelevant on appeal absent a claim of ineffective assistance of counsel. (See *Lopez, supra*, 42 Cal.4th at pp. 965–966.)

Once counsel has become attorney of record, virtually all decisions concerning trial tactics are controlled by the attorney, not the defendant. " 'A party to an action may appear in his own proper person or by attorney, but he cannot do both. If he appears by attorney he must be heard through him, and it is indispensable to the decorum of the Court, and the due and orderly conduct of a cause that such attorney shall have the management and control of the action and his acts go unquestioned by [anyone] except the party whom he represents. So long as he remains attorney of record the Court cannot

46

recognize any other as having the management of the case.  If the party for any cause becomes dissatisfied with his attorney the law points out a remedy. He may move the Court for leave to change his attorney, . . .  Until that has been done, the client cannot assume control of the case.' " (*Magee, supra*, 34 Cal.App.3d at p. 213, quoting *Board of Commissioners v. Younger* (1865) 29 Cal. 147, 149.)  Thus, " '[i]n both civil and criminal matters, a party's attorney has general authority to control the procedural aspects of the litigation and, indeed, to bind the client in these matters'; in other words, 'counsel is captain of the ship.' " (*People v. Masterson* (1994) 8 Cal.4th 965, 969.)

Because Lattin's personal objection during trial did not preserve his claim of witness coaching for review, the claim was patently forfeited. Regardless, were we to conclude Lattin's claim was reviewable, we would reject it for lack of foundation in the appellate record.  The appellate record does not support Lattin's overstated claims about the observations made by the trial court judge and bailiff.  Their statements cannot fairly be read to be observations the prosecutor was engaged in improper signaling to witnesses.

In response to defense counsel's concern that the prosecutor "perhaps inadvertently signaled a response to his witness," the trial judge explicitly stated:  "I haven't seen that but I will say that . . . I don't think there's anything like that being done.  I haven't noticed the witness has responded with signaling or along those lines . . . . [¶]  So, I'm not finding any sort of misconduct or negligence related to this."

The bailiff also explicitly confirmed—*after reviewing a videotape of the prosecutor*—that [he] did not "see anything on the video that would lead [him] to believe that the [p]rosecutor was gesturing to the witness or motioning to the witness or making faces at the witness or anything . . . along those lines."

47

In direct conflict with these statements by the trial judge and bailiff, Lattin misdescribes the record by claiming the judge and bailiff both observed the prosecutor using "hand gestures" to "indicate to witnesses that they were giving the correct answer," "which confirmed the prosecutor was sending signals to the witnesses about their testimony as he questioned them." While the trial judge did observe the prosecutor had an unintentional, "stylistic mannerism" in response to witness testimony that gave "somewhat of an appearance [the witness] answered the question correctly," he did not describe the mannerisms as "hand gestures" and stated, "I don't think that's your intent." As noted, the bailiff *watched a video of the prosecutor* and confirmed he did not see anything "that would lead [him] to believe the [p]rosecutor was gesturing to the witness." He described the prosecutor's mannerisms as "fidgeting" by moving his finger and hand to his mouth.

Lattin's mischaracterization of these observations of the prosecutor's mannerisms as "hand gestures" used to "coach[ ]" witnesses is not well taken. If Lattin's claim were not forfeited, we would reject it because the record does not support it.

B.  *Allegation the Prosecutor Misstated the Law During Closing Argument*

Lattin contends the prosecutor misstated the law during closing argument by "telling jurors, 'the elements of simple assault and assault with a firearm' " were " 'identical.' " This claim is forfeited because defense counsel failed to object. (*People v. Clark* (2011) 52 Cal.4th 856, 960 (*Clark*).)

Were this claim not forfeited, we would reject it—*again*—on the ground it is not based on a full and fair recounting of the record. Literally a few sentences after saying the elements were the same, the prosecutor explained what he meant by this statement. The prosecutor did this while showing the

48

jury slides with the elements of each offense written out side by side.  He explained the first four elements were identical, and the fifth element was identical except for requiring the use of a firearm:

> "[W]e are going to very quickly look at the elements of simple assault and for assault with a firearm they're identical.  Ladies and gentlemen, above is a number of lines 1 through 5, those refer to assault with a firearm.  Below that are the elements 1 through 5 for simple assault.  They are almost identical word for word with the difference of top 5 lines talking about use of a firearm."

This was a correct statement of the law.  (§§ 240, 245, subd. (a)(2).)

C.    *Allegation the Prosecutor Improperly Disparaged Defense Counsel*

Lattin asserts the prosecutor committed misconduct during closing argument because he improperly disparaged defense counsel by telling the jury (1) he was "wearing the white hat," (2) defense counsel was trying to "trick" them, and (3) Lattin was "a liar and a coward."  Once again, defense counsel did not object to any of these statements.  Lattin's challenge to them is forfeited.  (*Clark, supra,* 52 Cal.4th at p. 960.)

If not forfeited, we would find no error on the ground asserted by Lattin.  The legal authority invoked by Lattin is that "[a] prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel."  (*People v. Hill* (1998) 17 Cal.4th 800, 832.)  It is also misconduct for a prosecutor to characterize the defense bar in general as comprised of liars or to accuse defense counsel in a particular case of lying to the jury.  (*People v. Young* (2005) 34 Cal.4th 1149, 1193.)  Misconduct on this theory is established if "there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury."  (*People v. Cummings* (1993) 4 Cal.4th

49

1233, 1302 (*Cummings*), disapproved on another point in *People v. Merritt* (2017) 2 Cal.5th 819 (*Merritt*).)

On the other hand, it is settled that "[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*Cummings, supra*, 4 Cal.4th at p. 1302, fn. 47.) And it is not misconduct for a prosecutor to call *the defendant* a liar. " 'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 433 (*Boyette*).)

Here, the prosecutor commenced rebuttal argument by telling the jury he had spent a lot of time the night before preparing, and during his preparation, he "thought about what I've been told every day as a prosecutor, to wear the white hat. In a western cowboy film back in the day when they used to show the hero, they would say, wear the white hat. [¶] Ladies and gentlemen, wearing the white hat doesn't mean I have to allow manipulation, deception or allow facts that never came into evidence or [that] weren't true to come into this courtroom. We're going to address some of the things you heard yesterday right now."

Lattin contends these comments "improperly implied defense counsel was the villain in the case, and he was the good guy." We disagree. Read in context, the prosecutor's statements were directed at his view of the shortcomings of defense counsel's argument. Although we question the

choice of cowboy imagery to describe oneself to a jury,[11] we do not believe jurors would understand the prosecutor's particular metaphor here to be directed at impugning the integrity of defense counsel.

Lattin's other bases for error are the use of the word "trick" to characterize arguments by defense counsel and accusations by the prosecutor that Lattin lied during his testimony. As noted, it is not misconduct to call the defendant a liar. (*Boyette, supra*, 29 Cal.4th at p. 433.)

As for the strong criticism of defense counsel's argument, prosecutors have "wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) Our high court found no misconduct where the prosecutor said defense counsel can " 'twist' [and] 'poke' [and] try to draw some speculation, try to get you to buy something.' " (*People v. Medina* (1995) 11 Cal.4th 694, 759.) The Court found no misconduct where the prosecutor accused counsel of making an " 'irresponsible' " third party culpability claim. (*People v. Frye* (1998) 18 Cal.4th 894, 977–978, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 420.) And the Court found no misconduct where the prosecutor argued, " 'That's the tactic that many defense attorneys employ. Confusion. Throw up smoke. Try and mislead jurors.' " (*People v. Caro* (2019) 7 Cal.5th 463, 512.)

The language used here does not rise to the level of aggressive rhetoric used in any of these cases where our high court found no misconduct. We

---

11    We do not address whether the prosecutor may have engaged in improper vouching. It is improper for a prosecutor to "invoke[ ] his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of [closing] argument." (*People v. Anderson* (2018) 5 Cal.5th 372, 415.) Lattin did not raise this issue here or below. In any event, the prosecutor's "brief remark[s] could not have been prejudicial." (*Ibid.*)

agree with the People "it would have been apparent that the prosecutor was talking about misleading or confusing defense tactics, not [a] lack of integrity on the part of defense counsel." In sum, Lattin's contentions of prosecutor misconduct are forfeited and without merit.

## VI.

### *The Trial Court Erred When It Imposed an Upper Term Sentence Based on Invalid and Unproven Aggravating Factors*

Lattin contends the trial court erred when it imposed the upper term for his assault with a firearm conviction based on aggravating factors that were not proven to a jury in compliance with section 1170(b). He claims the error violated the requirement of the Sixth Amendment to the United States Constitution that " 'each element of a crime be proved to the jury beyond a reasonable doubt.' " (*People v. Lynch* (2024) 16 Cal.5th 730, 742 (*Lynch*), quoting *Alleyne v. United States* (2013) 570 U.S. 99, 104; accord *Apprendi, supra*, 530 U.S. at p. 476.) We agree and remand for resentencing. For guidance on remand, we alert the parties to what appears to be an additional sentencing error involving the dual use of facts.

A.    *Sentencing Error*

Effective January 1, 2022, the Legislature amended section 1170(b) "to prohibit imposition of an upper term sentence unless aggravating circumstances justify that term and the facts underlying any such circumstance, other than a prior conviction, 'have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.' " (*Lynch, supra*, 16 Cal.5th at p. 742, quoting § 1170(b)(2).) This rule is subject to one exception. "[T]he court may consider the defendant's prior convictions in determining sentencing based on

a certified record of conviction without submitting the prior convictions to a jury."  (§ 1170(b)(3).)

Here, the trial court committed a straightforward violation of section 1170(b) when it relied on facts not proven as required by section 1170(b) to impose the upper term.  The court relied on four aggravating facts as follows:

(1) "The Court finds the crime involved great violence."

(2) "The defendant was armed with a weapon at the time."

(3) "The defendant has served a prior prison term."

(4) "The Court also believes the defendant has significant anger issues as evidenced by his outbursts during trial, his behavior during trial.  The Court finds that he sometimes has significant anger issues."

In mitigation, the court made two findings:  (1) the firearm "was not loaded," and (2) the "prior conviction was from 2010."

Only one of these aggravating factors was necessarily found true by the jury.  The jury necessarily found Lattin was armed with a weapon when it found true he personally used a weapon in violation of section 12022.5, subdivision (a).  (Compare, §§ 12022, 12022.5; see *People v. Bland* (1995) 10 Cal.4th 991, 996–998.)  The jury was not asked to consider whether the crime involved "great violence," whether Lattin had "anger issues," nor whether Lattin served a prior term in prison.

The use of three unproven aggravating facts to impose the upper term—the crime involved great violence, Lattin had anger issues as shown by his outbursts at trial, and Lattin served a prior term in prison—violated the federal constitution.  As our high court recently explained, under the current version of section 1170(b), "the facts supporting *every* aggravating circumstance upon which the trial court relies to 'justify' imposition of the

53

upper term must be properly proven as the statute requires. . . .  The current statute specifically empowers the court to choose an upper term only if the facts supporting each aggravating circumstance on which it relies have been resolved by the jury or otherwise established as the statute allows. . . . Excluding properly proven prior convictions or a defense stipulation, a jury finding is now required for all facts actually relied on to impose an upper term.  (*Lynch, supra*, 16 Cal.5th at p. 757, citation omitted.)  Because the statute works in this particular way, "the Sixth Amendment jury trial right attaches to every aggravating fact, other than a prior conviction, used to justify imposition of the upper term."  (*Id.* at p. 767.)  Thus, "a Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established."  (*Id.* at p. 768.) This is exactly the situation presented here.

The Attorney General does not contend otherwise.  He claims Lattin forfeited his objection to the sentence by failing to object below, and that any error was harmless.  We disagree.

B.      *No Forfeiture*

The error Lattin raises here is a species of instructional error that generally requires no objection by a criminal defendant to raise on appeal. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.)  "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)  The trial court's sua sponte duty includes instructing on the essential elements of each charge.  (*People v. Mil* (2012) 53 Cal.4th 400, 409.)  The trial court's duty to instruct on required elements includes instructing on "sentencing factors," which, "like

54

elements . . . have to be tried to the jury and proved beyond a reasonable doubt." (*Washington v. Recuenco* (2006) 548 U.S. 212, 220.)  Not instructing on essential elements is "very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee." (*Merritt, supra*, 2 Cal.5th at p. 824.)  Where a defendant's substantial rights are affected, no objection is required to raise this type of error on appeal.  (§ 1259.)

The Attorney General's reliance on *People v. Scott* (1994) 9 Cal.4th 331 is misplaced.  The Court in *Scott* addressed forfeiture in the context of a former version of section 1170(b).  Under the former version, the trial court had "broad discretion" based on its own finding of facts "to impose the lower or upper term instead of the middle term of imprisonment" so as "to tailor the sentence to the particular case." (*Scott, supra*, at p. 349.)  For many policy reasons, the Court concluded "that the waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its *discretionary* sentencing choices." (*Id.* at p. 353, italics added.)  Its specific holding was:  "[W]e hold that complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*Id.* at p. 356.)  By contrast, the sentencing error here involves a new version of section 1170(b), and the *non-discretionary* federal constitutional right to a jury trial on *every* aggravating fact used to increase a defendant's sentence.  (*Lynch, supra*, 16 Cal.5th at p. 742.)  The holding in *Scott* does not apply to this type of error.

Regardless, the law was in a state of uncertainty when Lattin was sentenced.  At the time, it was not clear whether every aggravating fact used to support the imposition of an upper term sentence had to be found true beyond a reasonable doubt by a jury or whether a true finding by a jury on a

single aggravating fact was sufficient to render an upper term sentence constitutional.  (See *People v. Falcon* (2023) 92 Cal.App.5th 911, 928–937 [discussing the many conflicting appellate decisions that had interpreted § 1170(b) at the time of the underlying sentencing hearing], disapproved in *Lynch, supra*, 16 Cal.5th at p. 751.)  For this reason, even if Lattin's failure to object constituted a forfeiture, we would extend fairness to him and exercise our discretion to reach the merits of his claim of sentencing error.  (*People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6.)

C.      *Prejudice*

We use the *Chapman* standard when we assess whether the trial court's omission of a required element in its instructions to the jury was prejudicial.  (*Merritt, supra*, 2 Cal.5th at p. 829.)  Under that standard, Lattin is entitled to a reversal and remand for resentencing "unless, after examining the entire cause, including the evidence as to all relevant circumstances . . . , we can conclude that the omission of a jury trial was harmless beyond a reasonable doubt as to *every* aggravating fact the trial court used to justify an upper term sentence."  (*Lynch, supra*, 16 Cal.5th at p. 775, citation omitted.)

Our task is made easy here because there was no evidence whatsoever adduced at trial that Lattin served a term in prison.  Lattin testified he had a prior conviction, but the trial court specifically excluded all evidence he served a prison term by an in limine order.

Under *Almendarez-Torres v. United States* (1998) 523 U.S. 224, trial court judges are permitted "to undertake the job of finding the fact of a prior conviction."  (*Erlinger v. United States* (2024) 602 U.S. 821, 837.)  This exception to the rule, however, permits a judge to " 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements,

56

the defendant was convicted of.' " (*Id.* at p. 838.) The exception accordingly does not extend to finding a defendant served a prison term for a prior conviction. (See *id.* at pp. 838–839.)

Given the complete lack of evidence submitted to the jury, it would have been improper for the jury to render a true finding on this particular aggravating fact. As a consequence, the trial court's reliance on this fact to aggravate Lattin's sentence was not harmless. (*Lynch, supra,* 16 Cal.5th at p. 775.) Lattin is entitled to reversal and remand for resentencing.

D.     *Guidance on Remand*

Several rules prohibit the court from the dual use of facts to increase a defendant's sentence. (E.g., Cal. Rules of Court, rule, 4.425(b).) Relevant here, "[t]he court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law." (§ 1170, subd. (b)(5); *People v. Coleman* (1989) 48 Cal.3d 112, 163.) For guidance on remand, we observe, without deciding, that the trial court appears to have violated this rule by relying on a finding that Lattin "was armed with a weapon" during the crime when that fact was already used to enhance his sentence pursuant to section 12022.5, subdivision (a), for personal use of a gun.

## DISPOSITION

The sentence is vacated, and the matter is remanded for further proceedings consistent with this opinion. The judgment is affirmed in all other respects.

DO, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

58